**BEVERLY CALIFORNIA CORPORATION, a California corporation, doing business as Applegate East Nursing Home, Appellant,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services; Chester Stroyny, Administrator, Region V, Health Care Financing Administration of the U.S. Department of Health and Human Services, Appellees.**

No. 95–1389.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1995.

Decided March 13, 1996.

David C. Beck, Washington, D.C., argued (Elizabeth A. Lewis, on the brief), for appellant.

Alan S. Dorn, Assistant Regional Counsel, Chicago, Illinois, argued (Shirley Moscow Michaelson, on the brief), for appellees.

Before FAGG, HEANEY, and WOLLMAN, Circuit Judges.

HEANEY, Circuit Judge.

On July 22, 1988, the Secretary of Health and Human Services ("the Secretary") cancelled Applegate East Nursing Home's ("Applegate") eligibility to receive Medicaid funds. The nursing home appeals the district court's decision upholding that action. We affirm.

## BACKGROUND

Title XIX of the Social Security Act, commonly known as the Medicaid Act and codified at 42 U.S.C. §§ 1396–1396n (1982) ("the Act"), establishes a comprehensive scheme whereby the federal government assists states in providing medical assistance to "aged, blind or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396.[1] The Act includes a scheme of review and enforcement designed to ensure that Medicaid recipients residing in nursing facilities receive quality medical and psychosocial care. States are responsible for establishing health standards and for monitoring whether participating institutions satisfy these requirements. The Secretary has broad oversight responsibilities to evaluate the adequacy of state plans and to ensure that providers comply with federal standards.

As mandated by the Act, the Secretary has established an enforcement mechanism under which states must conduct annual, unannounced surveys of nursing homes. In conducting these surveys, state examiners are required to use detailed federal standards, methods, forms, and procedures as set out in federal regulations. 42 C.F.R. § 431.610(f)(1); 42 C.F.R. § 488, Subpart C. On the basis of the survey results, the Secretary determines whether individual providers are eligible for certification, which is necessary to receive Medicaid funds. In addition to this oversight authority, the Medicaid Act also authorizes the Secretary to make independent determinations that facilities do not meet federally-prescribed health and safety requirements. 42 U.S.C. §§ 1396i(b)(1) and 1396a(a)(33)(B). If, as a result of this independent examination, the Secretary determines that a particular facility is not in compliance with federal standards, the Secretary may cancel that facility's certification. This statutory authority for independent review is commonly referred to as the Secretary's "look behind" termination authority.

Beverly California Corporation, through a wholly-owned subsidiary, owns and operates Applegate in Galesburg, Illinois. Applegate, a 105–bed residential facility, provides nursing care to Medicaid beneficiaries as an intermediate care facility. Between April 26, 1988 and April 29, 1988, three representatives from the Regional Office of the Health Care Financing Administration ("HCFA")[2] conducted a federal look-behind survey of Applegate. The survey team observed numerous regulatory violations including the following: restraints left on residents without release for periods exceeding two hours; vest restraints applied improperly creating a risk of strangulation; frail residents lifted and ambulated in a manner that posed a substantial threat of injury; failure to observe basic

---

1. Unless otherwise indicated, all statutory and regulatory citations refer to the laws and regulations in effect in 1988.

2. HCFA is the agency within the Department of Health and Human Services that is responsible for the administration, operation, and oversight of the Medicaid program.

hygiene conventions creating a serious risk of infection; dirty and unlabeled personal items and equipment scattered throughout the facility; physical therapy administered by an unqualified employee; inadequate physical therapy regiments; and discontinuation or delay of physical therapy without physician consultation. On July 22, 1988, a statement of deficiencies was sent to Applegate in which HCFA informed the nursing home that as a result of its failure to satisfy the requirements for an intermediate care facility, the Secretary would cancel its Medicaid certification effective October 1, 1988.

Applegate appealed the Secretary's termination decision to an administrative law judge ("ALJ"). On August 28, 1988, the ALJ issued a decision reversing the Secretary's decertification of Applegate. Although the ALJ rejected Applegate's procedural claim that the survey results were per se invalid because HCFA deviated from its own standards and procedures for conducting surveys, the ALJ determined that the Secretary could not disqualify Applegate from participation in the Medicaid program because she failed to demonstrate that any of the nursing home residents had suffered actual harm as a result of the cited deficiencies.

HCFA appealed the ALJ's decision to the Appeals Council. In a January 6, 1994 decision, the Appeals Council affirmed the decision of the Secretary to cancel Applegate's participation in the Medicaid program based on the April 1988 survey. The Appeals Council concluded that the ALJ applied the wrong legal standard:

> [A] strong potential for harm to residents is inherent in significant deviations from the regulatory standards. Therefore, the Administrative Law Judge should have evaluated the survey findings pertaining to the various elements in the Survey Report Form, not only in terms of any "actual harm," but in terms of their severity and frequency without reference to any further "actual" consequences to determine whether significant regulatory deficiencies were established.

Appeals Council Op. at 9.

At the parties' request, rather than remand the case to the ALJ to reconsider the evidence under the appropriate standard, the Appeals Council applied the standard to the evidence in the record before the ALJ as well as the parties' written and oral submissions made in connection with the request for appellate review. Like the ALJ, the Appeals Council rejected Applegate's procedural claims that the survey team's deviations from established survey protocol rendered the survey invalid. However, where there was a "significant ambiguity in the record . . . the Appeals Council [gave Applegate] the benefit of the doubt in view of the procedural problems in this case." *Id.* at 10.

The Appeals Council applied the following standard to the survey findings and the Secretary's decertification decision:

> Deficiencies which substantially limit a facility's capacity to render adequate care *or* which adversely affect the health and safety of residents constitute noncompliance with one or more regulatory standards. The severity and frequency of any deficiencies should be considered in making this determination, and . . . a strong potential for an adverse effect on resident health and safety will constitute noncompliance as will an actual adverse effect or "actual harm."

*Id.* The Appeals Council concluded that Applegate was in noncompliance with three of the regulatory standards required for participation in the Medicaid program: health services, individual health care plans, and rehabilitative services. The Appeals Council was "convinced that the findings cited by the survey team were such that there was a strong potential for adverse effect on residents' health." *Id.* at 33. Consequently, it affirmed the Secretary's decision to terminate Applegate's certification.

The district court affirmed the Appeals Council. Notably, eighteen pages of the court's nineteen-page opinion dealt with Applegate's procedural challenges to the survey. The court rejected each of Applegate's procedural claims: (1) the survey was invalid because the team failed to follow prescribed survey procedures; (2) the survey constituted an unlawful administrative search and seizure in violation of the Fourth Amendment; (3) HCFA prejudiced Applegate's ability to defend itself by failing to timely notify

the nursing home of its cancellation decision; and (4) HCFA's failure to preserve the notes and working papers from the survey violated Applegate's due process rights. With respect to Applegate's substantive claim that the Secretary's termination decision was not supported by substantial evidence, the district court said only:

> After reviewing the Appeals Council decision, and the evidence upon which it relies, this court finds that there was substantial evidence for the decision. Applegate raises many complaints about particular details of the Appeals Council's analysis, but the court is satisfied that a minute consideration of the evidence is not required.... Applegate spent the majority of its efforts trying to invalidate the April 1988 survey. Once Applegate lost that battle, there was little chance for it to prevail on its argument that the cancellation decision was against the substantial evidence.

Dist. Ct. Op. at 19.

On appeal to this court, Applegate again raises almost completely procedural challenges to the look-behind survey. Applegate contends: (1) the Secretary exceeded her legal authority by conducting the federal look-behind survey of Applegate without articulable cause; (2) the survey constituted an unconstitutional warrantless search in violation of the Fourth Amendment; and (3) the survey results are invalid and violate Applegate's due process rights because HCFA failed to conduct the survey according to standardized procedures. Finally, Applegate asserts that the decertification decision is not supported by substantial evidence.

## DISCUSSION

### I. Mootness

If nothing else, the parties agree that this process has been a slow one. HCFA originally notified Applegate that its termination from the Medicaid program would take effect October 1, 1988. That decision became final when the Appeals Council issued its decision on January 6, 1994. As of December 28, 1994, however, the Secretary reinstated Applegate's certification to receive Medicaid reimbursement. Thus, at the conclusion of oral arguments, we asked the parties to submit supplemental briefs on the issue of whether reinstatement of the nursing home's certification rendered the case moot. We hold that the case is not moot.

A case is moot when it no longer presents "live" issues or when the parties lack a legally cognizable interest in the outcome. *Powell v. McCormack*, 395 U.S. 486, 496–97, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969); *Thomas v. Bennett*, 856 F.2d 1165, 1167 (8th Cir.1988). Despite the nursing home's current eligibility to receive Medicaid reimbursement, both Applegate and the Secretary continue to have legally cognizable interests in the outcome of this appeal. Applegate was not certified to participate in the Medicaid program for a period of some twelve months. During this period, Applegate continued to provide nursing care to its approximately sixty Medicaid residents. Our determination as to the validity of the Secretary's termination decision will control whether Applegate is entitled to reimbursement for the services it rendered during the period of its disqualification. In addition, under current regulations, the prior survey history of a nursing home facility impacts the types of penalties that may be imposed for cited deficiencies in the future. *See* 42 C.F.R. § 488.404(c) (1995). Therefore, this appeal is not moot. We proceed to our consideration of the merits.

### II. Applegate's Procedural Challenges to the Survey

First, Applegate claims that the survey is invalid because the Secretary exceeded her statutory authority in conducting a federal survey of Applegate. According to the nursing home, the Secretary must articulate some reason to believe that the state certification of the particular institution is invalid before she can exercise her look-behind authority. Thus, according to this argument, a random federal survey exceeds the Secretary's statutory authority. We reject this narrow interpretation of the Secretary's role under the Medicaid Act.

The Medicaid Act specifically imposes upon the Secretary a duty to assure that Medicaid recipients in intermediate care fa-

cilities receive high-quality medical care and rehabilitative services. As the Tenth Circuit has observed, the Secretary, not the states, determines which facilities are eligible for federal funds and she "has a duty to establish a system to adequately inform herself as to whether the facilities receiving federal money are satisfying the requirements of the Act." *Estate of Smith v. Heckler,* 747 F.2d 583, 589 (10th Cir.1984). The Act provides in relevant part:

> A State plan for medical assistance must—
>
> . . . .
>
> provide—
>
> . . . .
>
> that ... the State or local agency utilized by the Secretary [to determine, for example, whether a facility meets the definition of an intermediate care facility] ... will perform for the State agency administering or supervising the administration of the plan approved under this subchapter the function of determining whether institutions and agencies meet the requirements for participation in the program under such plan, *except that, if the Secretary has cause to question the adequacy of such determinations, the Secretary is authorized to validate State determinations and, on that basis, make independent and binding determinations concerning the extent to which individual institutions and agencies meet the requirements for participation.*

42 U.S.C. § 1396a(a)(33)(B) (emphasis added).

■ Applegate interprets this provision as limiting the Secretary's discretion to exercise her look-behind authority to instances in which she can articulate some reason to question the validity of the state's certification of a *particular* facility. Applegate misreads the provision. If the Secretary has reason to question the general adequacy of the state enforcement system, she can (and must) exercise her look-behind authority so as to make an independent compliance assessment. There is simply no statutory requirement that the Secretary make a specific finding of individualized suspicion before exercising her discretion to conduct a federal survey. Therefore, we find little significance

in the fact that HCFA was unable to articulate a specific reason why Applegate was selected for a federal survey. Moreover, Applegate concedes that it was selected as part of a sample to evaluate Illinois' survey performance, a ground expressly approved in the legislative history of the Act. 1980 U.S.C.C.A.N. 5526, 5932. Therefore, we hold that the Secretary did not exceed her statutory authority in this case.

Next, Applegate argues that the April 1988 federal survey violated the Fourth Amendment's prohibition of unreasonable searches. Applegate readily concedes that nursing homes are part of a closely-regulated industry, that the government has a substantial interest in ensuring the health and safety of Medicaid patients, and that warrantless inspections are necessary to serve that substantial government interest. Further, Applegate acknowledges that the statutory scheme that establishes random, unannounced surveys by states provides a valid substitute for the constitutional requirement of a warrant. Nevertheless, Applegate asserts that the April 1988 federal survey of its facility violated the Fourth Amendment because it was conducted by federal rather than state agents.

■ Applegate, like any other Medicaid provider, participates in the program voluntarily. By agreeing to the terms of its participation, a provider is put on notice that its compliance with federal health and safety requirements will be monitored by frequent, random, unannounced state and federal surveys. Applegate simply cannot claim that the government violated any reasonable expectation of privacy. Moreover, contrary to Applegate's assertion, the scope of the federal survey was far from unbounded. Although the parties disagree about what standards, if any, the federal survey team was obliged to follow, it is clear from the record that the federal surveyors conducted the April 1988 survey in substantial accordance with the regulations governing state surveys. Those regulations inform Medicaid providers like Applegate what is expected of them and control the scope of the search. *Donovan v. Dewey,* 452 U.S. 594, 604, 101 S.Ct. 2534,

2541, 69 L.Ed.2d 262 (1981). We find no merit to Applegate's arguments that it lacked notice of the federal survey and that the scope of the federal survey was in any way unbridled; and, therefore, we reject the nursing home's assertion that its Fourth Amendment rights were violated.

▌ Finally, Applegate argues that the federal survey is invalid because the survey team did not follow uniform procedures. As stated above, review of the record reveals that the federal survey team substantially complied with the detailed regulations governing state survey methods and procedures. Unfortunately, prior to the administrative hearing in this case, HCFA lost or destroyed virtually all of the notes and work papers pertaining to the April 1988 survey. The items that remain are (1) the survey report form, a handwritten compilation of the work papers of the different surveyors and (2) the statement of deficiencies. We agree with the district court that HCFA should have preserved all of the work papers related to the survey and that Applegate should have had the opportunity to use the work papers in its defense. We also agree with the district court that the apparently unintentional destruction of survey working papers does not undermine the reliability of the survey report form and the statement of deficiencies. Admittedly, the working papers might have shed light on those instances in which the surviving survey documents directly conflict with each other, but Applegate did not suffer any prejudice in this respect because both the Appeals Council and the district court resolved all such ambiguities in Applegate's favor.

In sum, we reject all of Applegate's procedural challenges to the April 1988 federal survey and hold that the survey constituted a valid exercise of the Secretary's look-behind authority.

III. Substantial Evidence of Noncompliance

▌ Having rejected the procedural challenges to the survey of Applegate, we now consider the sufficiency of the evidence supporting the Secretary's decision to decertify Applegate. On this record, the substantive inquiry is a straightforward one. As a threshold matter, we agree with the Appeals Council that the relevant inquiry is not whether Medicaid patients suffered actual harm. A standard requiring harm to Medicaid patients before the Secretary could take action would improperly subvert the Secretary's oversight of the program. Rather, the appropriate inquiry is whether the cited deficiencies substantially limited the facility's capacity to render adequate care as defined by the Act.

▌ The Appeals Council carefully reviewed Applegate's responses to each of the cited violations. In each instance in which the Appeals Council upheld the survey findings, Applegate either admitted to the conduct or offered an inadequate response to the allegation. The Appeals Council concluded that Applegate was out of compliance with three of the regulatory standards and that those deficiencies substantially limited the facility's capacity to provide adequate care to its Medicaid patients. We hold that the Secretary's termination decision was fully supported by the evidence.

Accordingly, we affirm the district court.